[Cite as *Townsend v. Ohio Dept. of Transp.*, 2011-Ohio-3875.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MICHAEL TOWNSEND, Guardian, etc.

 Plaintiff

 v.

OHIO DEPARTMENT OF TRANSPORTATION

 Defendant

 Case No. 2008-11044

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiff brought this action individually and as guardian on behalf of his daughter, Violet Townsend, alleging claims of negligence against defendant, the Ohio Department of Transportation (ODOT). Plaintiff has also asserted claims of loss of consortium and spoliation. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} This case arises out of a motor vehicle accident that occurred on April 23, 2005, at approximately 8:15 a.m., in Independence, Ohio. At the time, Violet was driving on the exit ramp from Interstate 480 (I-480) to southbound Interstate 77 (I-77). It was raining heavily. According to eyewitness testimony, Violet was traveling within the posted speed limit at 50 to 55 miles per hour (mph) when her vehicle began to hydroplane; it spun out of control and crashed into a guardrail on the left side of the

roadway. Violet suffered severe injuries and has been in a persistent vegetative state since the time of the accident.

{¶ 3} In order to prevail upon a claim of negligence, plaintiff must prove by a preponderance of the evidence that defendant owed Violet a duty, that defendant's acts or omissions resulted in a breach of that duty, and that the breach proximately caused the injuries at issue. *Armstrong v. Best Buy Company, Inc.*, 99 Ohio St.3d 79, 81, 2003-Ohio-2573, citing *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77.

{¶ 4} ODOT has a general duty to maintain its highways in a reasonably safe condition for the traveling public. *Knickel v. Dept. of Transp.* (1976), 49 Ohio App.2d 335. ODOT's duties are more specifically defined in R.C. 5501.11(A)(1), which provides in pertinent part that ODOT is responsible for establishing "state highways on existing roads, streets, and new locations and [to] construct, reconstruct, widen, resurface, *maintain, and repair* the state system of highways and the bridges and culverts thereon[.]" (Emphasis added.)

{¶ 5} The issues in this case concern ODOT's maintenance of two storm-water catch basins located on the left side of I-480, a short distance north of the accident location. Plaintiff alleges that ODOT breached its duty to maintain the highway in a reasonably safe condition by failing to maintain, or periodically repair or replace, those basins and the outlet pipes to which they were attached. Plaintiff maintains that the basins were clogged with debris to the extent that they could not function as intended but, rather, allowed water to accumulate unnaturally on the highway. Plaintiff further maintains that ODOT was negligent in failing to implement a systematic, prioritized maintenance program to prevent or minimize hazards caused by clogged catch basins.

{¶ 6} ODOT denies liability and contends that plaintiff failed to factually prove either the cause of the accident or the condition of the catch basins during the time period in question. ODOT further asserts that it is entitled to discretionary immunity for its decision not to adopt a prioritized catch basin maintenance program. Finally, ODOT argues that any negligence that may be attributable to it is outweighed by Violet's own negligence.

{¶ 7} In support of his claim, plaintiff presented the testimony of 23 lay witnesses and that of an accident reconstruction expert. The following is a summary of the testimony and other evidence presented.

{¶ 8} ODOT's District 12, Independence Yard, was responsible for the day-to-day maintenance of the highways and adjacent areas where the accident occurred. Several ODOT employees, including George Holloway, the Independence Yard manager, and Brian Jung, the assistant manager, explained the procedures for maintaining catch basins. The testimony established that ODOT road crews were trained to be observant of conditions that needed attention on and along the roadways, that the roadways were inspected on a regular basis to identify problem areas, that special efforts were made during periods of heavy rainfall to inspect the roadways in order to identify any clogged catch basins that might be contributing to adverse driving conditions, and that normal procedures involved receiving and acting upon complaints from law enforcement personnel and the general public concerning roadway conditions.

{¶ 9} In addition to the Independence Yard's regular procedures, James Marszal, P.E., who was employed at the District 12 headquarters, communicated on an as-needed basis with the maintenance department if he observed an area on the roadway that he determined to be in need of attention. Marszal had worked as an Assistant Maintenance Engineer for more than 19 years prior to assuming the position of Pavement and Geotechnical Engineer that he held at the time of Violet's accident; however, he continued to provide assistance and support to his former department. Furthermore, Marszal drove through the I-480/I-77 area on his way to and from headquarters on each of his working days.

{¶ 10} At some point around the time of the accident, Marszal observed that during periods of heavy rainfall there would be more water on the I-480 ramp to I-77 than he would have expected. He also noticed that the guardrail in the area sustained more dents and damage than he considered to be normal for a section of straight roadway. Marszal began to consider potential causes for those conditions, including the possibility of clogged catch basins. He subsequently observed debris in the two catch basins where the accident occurred. Marszal sent an e-mail to Holloway, Jung, and several other maintenance employees at the Independence Yard to request that

someone look into the matter and clean out the catch basins if necessary. Despite the efforts of counsel and the involvement of the court in the parties' pretrial discovery issues, Marszal's e-mail to Holloway, and any follow-up e-mails, could not be retrieved from computer archives and were not available at trial. It is not clear whether Marszal's e-mail was sent before or after Violet's accident or what action was taken in response to it.

{¶ 11} With respect to the necessity for a catch basin maintenance program, evidence was presented that, prior to 2004, William Burnett, Manager of the Mayfield Yard in District 12, requested that George Fowler, an ODOT program specialist, develop an inventory database of storm-water catch basins. The purpose of the database was to catalog the catch basins that then existed and to pinpoint their locations; no data concerning maintenance of the basins was included. At some time after that inventory was developed there was a culvert collapse on I-480. Fowler was then asked to create a culvert maintenance database and a "culvert team" was subsequently formed to inspect and prioritize the maintenance of culverts.

{¶ 12} The evidence established that there are over 2,500 storm-water catch basins in District 12's Cuyahoga County, where the accident occurred. According to the testimony, it is virtually impossible for ODOT to routinely service that number of catch basins with its available resources. In recognition of that circumstance, and several months after the culvert program was developed, the manager of ODOT's Cleveland Yard, Robert Boggess, began working on a maintenance tracking program for District 12's storm-water catch basins. Boggess recognized that certain catch basins required more maintenance than others. He discussed his ideas with his supervisor, Walter Biel, ODOT's Cuyahoga County Assistant Manager, and he assembled a "sewer rat" team. Boggess then prepared a team charter to present to ODOT's Quality Services through Partnership committee. The purpose of the team was to create a systematic approach to identifying and prioritizing the maintenance of storm-water catch basins. Although the charter was presented and approved, and the team met at least six times to discuss their mission, their plans never came to fruition. As of the time of trial, ODOT had not implemented the proposed catch basin maintenance program.

{¶ 13} Plaintiff's expert, William Jackman, P.E., opined that ODOT was negligent in several respects. Jackman visited the accident scene in July 2009 and photographed the catch basins in question. The photographs show that one of the catch basins was clogged up to the level of its grate cover and that the other had weeds and other vegetation growing out of it. Based upon all of the evidence that he reviewed, it was Jackman's opinion that standing water caused by at least one clogged catch basin contributed to an unnatural accumulation of water on the highway and resulted in the hydroplaning of Violet's vehicle. According to Jackman, ODOT knew or should have known that clogged or partially clogged catch basins would allow water to accumulate within the traveled portion of the roadway, that prioritized catch basin maintenance was required to minimize clogging, that accumulations of water in a lane of travel would not be readily apparent to approaching motorists, and that the increased incidence of guardrail damage had to have an identifiable cause that should have been investigated. With regard to the proposed catch basin maintenance program, Jackman opined that ODOT was negligent in failing to implement the same, particularly because a culvert maintenance program had been initiated and there was a catch basin inventory available.

{¶ 14} Upon consideration of all the evidence, the court finds as follows.

{¶ 15} As a general rule, ODOT is liable for damages caused by defects or dangerous conditions on state highways only where it has notice of the condition, either actual or constructive. *McClellan v. Ohio Dept. of Transp.* (1986), 34 Ohio App.3d 247, paragraph one of the syllabus. The distinction between the two types of notice is the manner in which the notice is obtained, or assumed to have been obtained, rather than in the amount of information conveyed. Generally, information that was personally communicated to or received by a party constitutes actual notice. Constructive notice is that which the law regards as sufficient to give notice and is regarded as a substitute for actual notice or knowledge. *In re Estate of Fahle* (1950), 90 Ohio App. 195, 197.

{¶ 16} Throughout the course of the proceedings plaintiff has relied heavily upon the holding in *Knickel*, supra, for the proposition that ODOT can be held liable on the basis of "general" notice. The *Knickel* case involved a period of time in the 1970s when concrete roadways that had been installed in the 1950s were being scheduled for

replacement due to the tendency of concrete to "blow-up," or heave upward, causing vehicles to be unexpectedly thrust into the air in an "Evel Knievel" fashion. The question before the court in that case was whether ODOT could be held liable under the facts, where it had general, but no particular notice as to the deterioration of the roadway that gave rise to plaintiff's injury. This court found in the affirmative on that issue.

{¶ 17} Upon review of this court's determination, the Tenth District Court of Appeals noted that "[t]he evidence clearly shows that a blow-up is a safety hazard in concrete highways which has existed for * * * over 50 years. Research has been done by experts to determine the cause of blow-ups and to prevent their occurrence. Ohio has been a forefront leader in this research * * *." Id. at 338-339. The appeals court found that, "based upon the evidence in this case, there is a general foreseeability that blow-ups will occur and that someone will be injured as the result. * * * [A]lthough there is no way to predict where, when, or with what magnitude a blow-up will occur, they can be prevented by the construction of non-concrete highways, and * * * be minimized by the construction of pressure relief joints in order to minimize the danger from blow-ups." Id. at 339.

{¶ 18} In determining who should bear the loss of sudden blow-ups, the state of Ohio, or the general public, the Tenth District held that "the better answer is the state which has the burden to maintain highways in a reasonably safe condition." Id. The appeals court concluded that this court did not err in finding that ODOT had general notice of the condition causing the highway to erupt and could therefore be held liable for its negligence in failing to maintain the highways in a reasonably safe condition.

{¶ 19} Plaintiff contends that the facts of this case mirror those of *Knickel* and that this court should reach the same result; that ODOT should be held liable because it had general knowledge that clogged or partially clogged storm-water catch basins would not function as intended and that it was foreseeable that, under such circumstances, water would accumulate unnaturally within the traveled portion of the roadway and create a hazard for unsuspecting motorists. Plaintiff further maintains that ODOT had general knowledge of the hazardous roadway conditions caused by clogged catch basins

because it had developed but not yet implemented a prioritized catch basin maintenance program.

{¶ 20} The court disagrees with plaintiff's analysis of the *Knickel* case and finds that the facts of that case differ markedly from the instant action. In *Knickel*, the cause of the hazardous condition of the roadway was clear (the heaving of the concrete material from which it was made), the condition had been well known and researched for many years, the solutions to the problem had been identified, plans and specifications had been drawn up to implement corrective measures, and there was little if any evasive action that a motorist could utilize when faced with a sudden, unexpected blow-up.

{¶ 21} By contrast, in the case of unnatural accumulations of water on the roadway, a blocked catch basin may be one cause of such condition but many other factors can be involved, including the grade of the roadway, the location, and the volume and type of traffic. More importantly, heavy rainfall in and of itself can cause hazardous driving conditions. As such, there is no clear solution to the problem as there was in *Knickel.* Although a prioritized catch basin maintenance program could help to reduce the occurrence of excess water on a particular area of roadway, it is not a definitive or permanent answer in the manner that replacement of concrete was in *Knickel.* Moreover, there is no evidence that motorists traveling through the I-480/I-77 interchange during periods of heavy rainfall routinely encountered unnatural accumulations of water on the roadway to the extent that it was generally foreseeable that such condition would occur and that someone would be injured as a result. Lastly, unlike the unexpected blow-ups at issue in *Knickel*, the accumulation of water on the roadway during a period of heavy rainfall is a known hazard that motorists are expected to anticipate and to guard against even if it is not open and obvious.

{¶ 22} In the final analysis, plaintiff has pointed to no case law other than *Knickel* in which the proposition of liability based upon general notice has been recognized or followed. Accordingly, the court concludes that ODOT cannot be held liable on such basis in this case.

{¶ 23} Plaintiff next contends that ODOT had actual or, at the least, constructive notice based upon Marszal's observations of water accumulations in the area of the

accident and the unusual amount of damage to the nearby guardrail. Plaintiff argues that, although it was not part of his employment responsibilities, Marszal's actual knowledge of the roadway conditions can be imputed to ODOT inasmuch as his engineering experience and employment history were highly respected, and ODOT maintenance employees responded to his requests whether or not they were obligated to do so. In the alternative, plaintiff argues that ODOT had constructive knowledge of the roadway conditions based upon the fact that, if Marszal observed such conditions, then the employees who were specifically charged with the responsibility of traveling the area and searching for potential hazards or maintenance issues should also have been aware of any clogged basins, unnatural accumulations of water, and the increased incidence of guardrail damage.

{¶ 24} Upon review, the court finds that plaintiff failed to prove that, prior to the time of Violet's accident, ODOT had either actual or constructive knowledge of any clogging of the catch basins at issue, that any such clogging was contributing to an unnatural accumulation of water at or near the I-480/I-77 interchange, or that maintenance or repair work was required in that area. The totality of the evidence simply fails to establish the condition of the catch basins at the time of the accident. Even assuming that Marszal's e-mail to Holloway and Jung had been recovered, Marszal testified quite credibly that he requested only that the catch basins be cleaned out "if necessary"; he recalled no specifics as to how much debris or clogging he had observed. There was no evidence as to the cause of the increased guardrail damage or whether it had any connection to the occurrence of accumulations of water on the roadway. Furthermore, the court is not persuaded by the testimony of plaintiff's expert, who based his opinions upon blockages he observed when he viewed the catch basins approximately four and one-half years after the accident. The court cannot infer from such evidence, even coupled with Marszal's observations, that clogging existed prior to the accident to the extent that it would have caused excess water on the roadway, or that such condition existed for a sufficient length of time that ODOT should have, in the exercise of reasonable care, been on notice to correct it.

{¶ 25} Moreover, the evidence established that the I-480 roadway in the area of the accident had an uphill grade, that it had a crowned configuration, and that such

characteristics were intended to cause water to flow away from the traveling lanes and into both the ditches and catch basins along the sides of pavement. The local police officer who investigated the accident noted no unusual accumulation of water when he arrived at the scene, and testified that he was not aware of any previous complaint of unnatural standing or pooling of water in the area. Marszal also testified that, although the water that he observed was not necessarily an open and obvious danger to motorists, he had always been able to pass through the area safely. Similarly, the witnesses who observed the accident, and who were following closely behind Violet, passed through the area without incident.

{¶ 26} The common law of Ohio imposes a duty of reasonable care upon motorists that includes the responsibility to observe the environment in which one is driving. See, e.g., *Hubner v. Sigall* (1988), 47 Ohio App.3d 15, 17. The weight of the evidence establishes that Violet's own negligence in failing to control her vehicle was the sole proximate cause of her injuries.

{¶ 27} Plaintiff has also argued that ODOT was negligent in failing to implement the catch basin maintenance program that it had developed and approved. Given the finding that Violet's own negligence was the sole proximate cause of the accident, plaintiff's arguments in this regard are moot. However, even assuming that such was not the case, it is well established that "[t]he state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State* (1984), 14 Ohio St.3d 68, 70; *Pottenger v. Ohio Dept. of Transp.* (Dec. 7, 1989), Franklin App. No. 88AP-832. ODOT's decision as to whether to implement a particular program, or how to best utilize its resources to maintain District 12's catch basins is clearly a policy decision of such nature. The court concludes that ODOT is entitled to discretionary immunity for its decisions surrounding the implementation of the proposed catch basin maintenance program.

{¶ 28} Finally, throughout the proceedings, and at the close of all of the evidence, the court entertained plaintiff's claim of spoliation of evidence. The claim concerns a partially blocked drain pipe that led from one of the two catch basins in question. The

condition was discovered by plaintiff's expert almost five years after the occurrence. The evidence is clear that only part of the drain pipe was removed from the area; the part closest to the catch basin along the I-480 ramp. Samples of the blockage were preserved and made available to plaintiff's counsel, but plaintiff's counsel never collected or tested the samples to determine their content.

{¶ 29} The elements of a claim for interference with or destruction of evidence are: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts[.]" *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 29, 1993-Ohio-229.

{¶ 30} In this case, given the finding that Violet's own negligence was the sole proximate cause of the accident, and considering the abundance of other evidence that plaintiff obtained and presented, it cannot be said that plaintiff was prejudiced or that his case was disrupted. Further, the court is not convinced that the removal of the portion of the drain pipe was "willful" in the sense that there was "an intentional and wrongful commission of the act." See *White v. Ford Motor Co.* (2001), 142 Ohio App.3d 384, 387. Accordingly, plaintiff's spoliation claim is DENIED.

{¶ 31} In summary, the court finds that plaintiff failed to prove his claims of negligence and spoliation by a preponderance of the evidence. Therefore, the derivative claim for loss of consortium also must fail. See *Bowen v. Kil-Kare, Inc.* (1992), 63 Ohio St.3d 84, 93. Judgment shall be entered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MICHAEL TOWNSEND, Guardian, etc.

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION

    Defendant

    Case No. 2008-11044

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

       This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Anthony S. Farren
Murray D. Bilfield
6300 Rockside Road, Suite 204
Independence, Ohio 44131

Robert E. Epstein
2421 Allen Boulevard
Beachwood, Ohio 44122

Christopher P. Conomy
William C. Becker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

LH/cmd
Filed July 7, 2011
To S.C. reporter August 2, 2011